**SIGNED THIS: December 29, 2020**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    18-71139 |
| WILLIAM E. BAKER, JR., | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| NANCY J. GARGULA, | ) | |
| United States Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No.    19-07004 |
| | ) | |
| WILLIAM E. BAKER, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court, for decision after trial, is the United States Trustee's

complaint objecting to the discharge of the Debtor, William E. Baker, Jr. For

the reasons set forth herein, judgment will be entered in favor of the United States Trustee, and the Debtor's discharge will be denied.

## I. Factual and Procedural Background

William E. Baker, Jr., ("Debtor") filed his voluntary petition under Chapter 7 on August 3, 2018. The Debtor was represented in the filing by Attorney Roy Dent. Andrew Erickson was appointed as the case trustee ("Trustee"), and the Debtor's first meeting of creditors was conducted by the Trustee on September 9, 2018.

Shortly after the creditors meeting, the Trustee filed a motion seeking to compel the Debtor to attend an examination under Rule 2004 and to produce documents related to his bank accounts, business interests, pending litigation, and financial transactions. In his motion, the Trustee asserted that he had visually inspected the Debtor's residence and saw a tractor, a trailer, and a commercial truck on the premises that had not been scheduled. He also said that the Debtor was involved in state court litigation wherein he was pursuing a counterclaim that had not been scheduled. The Trustee also stated that the Debtor had disclosed interests in several businesses and transfers to insiders, all of which needed further investigation. The Trustee's motion was granted. The Debtor appeared for the Rule 2004 examination on November 7, 2018. On November 15, 2018, he filed several amended schedules and an amended statement of financial affairs ("SOFA").

On February 11, 2019, after having obtained an extension of the originally set deadline, the United States Trustee ("UST") filed an adversary complaint objecting to the Debtor's discharge. The UST alleges in the complaint that the Debtor failed to disclose on his schedules an interest in his residence in Edinburg, Illinois, at least one of the several accounts he held at Regions Bank, a one-third interest in two oil wells, a Scatcat Skidsteer with attachments, and a travel trailer valued at $40,000. The UST also alleges that, although the Debtor disclosed on his original SOFA the transfer of an interest in his Edinburg residence to his son and the transfer of a Mack truck to his wife, he failed to disclose the transfer of a 12.5% interest in an oil well to a business partner, Bryce Geiler. According to the UST, the Debtor also failed to disclose on his SOFA the refinance of the Edinburg residence in June 2018 whereby he obtained over $25,000, as well as the subsequent transfer of $12,000 of those funds to a friend, Rod Jackson, and the use of $9000 to purchase a truck, which he titled in the name of David Clark. The UST also alleges that, at his creditors meeting, the Debtor was placed under oath by the Trustee and affirmed the accuracy and completeness of his schedules and SOFA. Specifically, the Debtor affirmed that he had disclosed all of his assets and all transfers and financial transactions as required. The UST claims that, by reason of his omission of required disclosures on his schedules and SOFA and at his creditors meeting, the Debtor had concealed assets and made multiple false oaths and, accordingly, should be denied a discharge.

The Debtor answered the complaint, admitting that he had failed to disclose on his schedules and SOFA his retention of a life estate in his Edinburg residence, his ownership interest in two oil wells, his transfer of an interest in an oil well to Bryce Geiler, his refinance of the Edinburg property and the resulting receipt of $25,000, his transfer to Rod Jackson of $12,000, and his purchase of the $9000 truck titled in the name of David Clark. The Debtor also admitted not scheduling ownership of an account at Regions Bank and the Scatcat Skidsteer but claimed that both were assets of his business, Midstate Repair Service. With respect to the travel trailer, the Debtor claimed that he had given it to David Clark approximately five years before filing bankruptcy. In a subsequently filed pretrial statement, the Debtor admitted that his schedules and SOFA contained "numerous errors" but claimed that he suffered memory loss due to cancer treatments he had received. He asserted that his memory failed him repeatedly during the preparation of his schedules and at his creditors meeting.

At a pretrial conference held May 9, 2019, the Court adopted a discovery schedule proposed jointly by the parties and entered an order imposing a final deadline for completion of all discovery by October 9, 2019. The deadline was extended twice at the request of the UST due to the Debtor's failure to comply with discovery requests and, specifically, the Debtor's failure to timely disclose his anticipated medical expert regarding his claimed memory loss. Finally, after the Court set one last final deadline for the disclosure of expert witnesses, the

Debtor acknowledged that he had no medical witness to disclose and discovery was concluded.

A status hearing was held June 18, 2020, and both attorneys reported that they were ready for trial. On that day, this Court's regular trial order was entered setting the matter for trial on August 6, 2020, at 9:00 a.m. Due to the coronavirus pandemic and the resulting closure of the courthouse to the public, the trial was scheduled to be conducted by video conference. The attorneys were advised that a subsequent order dealing specifically with issues related to video conference procedures would be entered.

The order regarding video conference procedures ("Video Order") was entered on July 1, 2020. The Video Order provided detailed information about the technical requirements for participating in the video conference and noted specifically that the use of a computer with a camera and microphone was required. Attached to the Video Order was a three-page document, created by the Court's information technology staff, providing step-by-step instructions for connecting to the video conference. The Video Order specifically provided that all attorneys and witnesses were required to connect to the video conference not less than fifteen minutes before the scheduled trial. Finally, the Video Order required the attorneys to electronically docket all proposed exhibits not less than seven days before the trial; all exhibits were to be clearly labeled by number or letter, and Bates numbering was required for all pages of the exhibits.

On July 30, 2020, the attorney for the UST docketed twenty-one exhibits, all properly labeled and numbered. Attorney Dent, on behalf of the Debtor, filed a certificate of service on July 29, 2020, saying that he had mailed copies of his exhibits to the UST on that date. He did not docket any exhibits, however, until August 6, 2020, when he docketed thirty-four exhibits, many of which were not labeled and all of which lacked consecutive page numbering.

When the case was called on August 6, 2020, Attorney Dent appeared but said that the Debtor was having computer trouble and requested a few minutes for the Debtor to complete his connection. After almost an hour of back and forth with the Debtor, who never connected to the video conference but did call in by telephone, it became apparent that the Debtor was using a computer that did not have a camera or microphone. Attorney Dent admitted that he had provided the Debtor with the log-in information for the video conference but had not specifically inquired of the Debtor whether his computer was equipped with a camera and microphone. Attorney Dent also acknowledged that, if he had known that the Debtor did not have the necessary equipment to connect to the video conference, he could have provided the Debtor with access to such equipment at his law office.

Attorney Dent requested that the trial be continued to another date. He suggested that the situation was akin to a debtor having car trouble on the way to the courthouse and argued that, under such circumstances, the Court would surely continue the matter. The attorney for the UST objected citing the prior delays in the case and arguing that the failure of the Debtor and Attorney

Dent to prepare for the hearing by testing their equipment was inexcusable. The Court agreed with the UST and suggested that the situation was not akin to a debtor having car trouble but more like a debtor without a car waiting until the morning of the trial to start looking for a ride to the courthouse. Attorney Dent acknowledged that he was aware that the Court had offered several opportunities for attorneys and parties to test their ability to connect to the Court's video system and that he and the Debtor had not taken advantage of such opportunities. The trial proceeded without the Debtor.

The attorney for the UST called the Trustee as his only witness. The Trustee testified that, prior to the creditors meeting, he had reviewed the Debtor's petition, schedules, and SOFA. He said that, at the creditors meeting, he not only asked the Debtor general questions about the accuracy of the documents but also asked the Debtor specifically if he had any ownership interest in real estate and whether he had disclosed all transfers of property. The Debtor had affirmed that he had no interest in real estate and that he had made all required disclosures of transfers of property. The Trustee said that, after the creditors meeting, he drove past the Debtor's residence in Edinburg, Illinois, and saw a trailer, truck, and skidsteer that had not been disclosed. He obtained more information about these undisclosed assets and transfers made by the Debtor by requesting the production of a volume of documents and conducting a Rule 2004 examination of the Debtor.

With respect to the skidsteer, the Trustee testified that he saw it when he drove past the Debtor's residence and then questioned the Debtor about it at

the Rule 2004 examination. The Debtor admitted that the skidsteer was owned by him and acknowledged that he had not scheduled it when he filed. The Trustee said that he initially demanded turnover of the skidsteer from the Debtor but subsequently accepted $1500 from the Debtor in lieu of the turnover.

The Trustee testified that the Debtor had disclosed initially that he had transferred his residence in Edinburg, Illinois, to his son, William E. Baker, III. At his creditors meeting, the Debtor denied having any ownership interest in real estate. The Trustee identified a copy of a deed dated May 5, 2017, signed by the Debtor transferring title to the Debtor's residence to his son; the Trustee noted that the deed reserved a life estate for the Debtor. The Trustee said that the Debtor had not scheduled any secured debt related to the real estate but he had learned that the real estate was encumbered by a mortgage to Midland Community Bank ("Midland"). The Debtor had scheduled the Midland debt as unsecured and said that he was a guarantor on the obligation even though the Trustee's investigation revealed that the Debtor had signed the mortgage loan documents as a principal. The Trustee also testified that the Debtor had refinanced the mortgage obligation to Midland in June 2018—just weeks before filing his bankruptcy—and had obtained $25,000 from that transaction. The Trustee identified copies of documents related to the refinance evidencing the Debtor's involvement in it and a copy of the check issued to the Debtor by Midland on June 27, 2018, in the amount of $25,053.36.

Because the Debtor had not previously disclosed his life estate, the refinance, or his receipt of over $25,000, the Trustee testified that his first opportunity to question the Debtor about these matters was at the Rule 2004 examination in November 2018. At that time, the Debtor admitted that he had a life estate in the Edinburg residence, that he had refinanced the property in June, and that he had received $25,000 in proceeds from the refinance. According to the Trustee's testimony, the Debtor also admitted that he had cashed the proceeds check from Midland for cash and spent all of the cash before his bankruptcy filing.

The Trustee testified that the Debtor told him during the Rule 2004 examination that he had used $9000 of the cash to purchase a truck, which he titled in the name of his cousin, David Clark. The Trustee said that the Debtor never produced any receipts or documents related to the truck purchase. The Trustee said that he was currently pursuing David Clark regarding the transfer he received from the Debtor.[1]

According to the Trustee, the Debtor also told him that he had used $12,000 of the cash from the refinance to assist a friend, Rod Jackson, who owned a local bait shop. The Debtor told him that part of the money was used to buy items for the bait shop and some of the money was given directly to Rod Jackson. Again, the Debtor produced no receipts or documents regarding these transactions. The Trustee testified that, despite his best efforts, he had never

---

[1] The Trustee has since settled with David Clark. A motion to compromise has been approved, and Mr. Clark is making monthly payments to the Trustee.

been able to locate Rod Jackson or find any information to confirm that the bait shop had ever existed.

Finally, as it relates to the cash from the refinance, the Trustee testified that he had discovered that the Debtor used $3000 of the funds to pay down a loan with Sheffield Financial ("Sheffield"). The Debtor had initially disclosed a debt to Sheffield in the amount of approximately $7900 secured by a riding lawn mower valued at $5000. The proof of claim filed by Sheffield was, however, only in the amount of $4684. According to bank records obtained by the Trustee, $3000 in cash was deposited into the Debtor's checking account at Regions Bank on July 12, 2018, and a check to Sheffield was issued that same day for a $3000 payment. Although the Trustee specifically asked the Debtor at his creditors meeting whether he had made any payments to any creditors of more than $600 in the 90 days before filing, the Debtor did not disclose the payment he made to Sheffield in the amount of $3000 just a couple of weeks before filing.

The Trustee testified that the Debtor also failed to disclose his interest in several oil wells. He said that he learned at the Rule 2004 examination that the Debtor had a one-third interest in two wells described as Brockelsby 3 and Sheldon 2. He also learned that the Debtor had transferred an interest in a well described as Sheldon 1 to a business associate, Bryce Geiler, in 2018. When the Debtor was asked at his creditors meeting whether he had disclosed all transfers of property, however, he affirmatively stated that he had even though he had not disclosed the transfer of his interest in Sheldon 1 to Mr. Geiler.

-10-

The Debtor's interest in an oil well maintenance business known as Midstate Repair Service ("Midstate") was also discussed by the Trustee in his testimony. On his SOFA, the Debtor disclosed Midstate as a sole proprietorship that he owned and had operated from 2013 to 2017. At his Rule 2004 examination, the Debtor confirmed that the business was a sole proprietorship but said that the business continued to operate and that the indication on his SOFA that it closed in 2017 was not accurate. The Debtor told the Trustee that David Clark worked in the business with him. The Debtor also said that a Mack truck used in the operation of the business had been transferred to the Debtor's wife when the Debtor learned he had cancer; the Debtor had disclosed that transfer, made in 2017, on his original SOFA.

The Trustee testified that the Debtor had not disclosed an account at Regions Bank related to Midstate. He identified a statement for Regions Bank account XXXX1405 that had been produced as part of the Debtor's Rule 2004 examination. The account statement showed title in the names of William E. Baker and David L. Clark, Jr., without any mention of Midstate. The undisclosed account held a balance of over $4000 on the date the Debtor filed his bankruptcy.

Issues regarding the Debtor's ownership of a travel trailer were also discussed by the Trustee in his testimony. The Debtor disclosed on his original SOFA that he was in possession of a travel trailer that he said was owned by David Clark. When questioned at his Rule 2004 examination about the trailer, however, the Debtor said that he owned the trailer and had received the trailer

from his uncle, William Holley. The trailer had been given to him as partial payment for money he was owed by Mr. Holley related to the sale of a Cessna airplane that they had previously jointly owned. The Debtor told the Trustee that Mr. Holley had obtained the title when he purchased the trailer but had never processed the title through required state procedures. The Debtor stated affirmatively that he had possession of the title and that he had told his wife, when he was diagnosed with cancer in 2017, that she would inherit the trailer if he passed away. The Trustee acknowledged that, although the Debtor provided this information at his Rule 2004 examination in November 2018, he filed an answer in this case in March 2019 claiming that he had given the trailer to David Clark more than five years before he filed his bankruptcy.

The last matter discussed by the Trustee was the Debtor's involvement in a state court lawsuit. The Debtor disclosed the lawsuit on his original SOFA and listed the plaintiffs in the lawsuit as creditors on his original schedules.[2] Under questioning by the attorney for the UST, the Trustee identified the docket from the lawsuit and noted that the case had been set for trial before the state court for August 6, 2018. The timing of the Debtor's bankruptcy filing on August 3, 2018, appeared to be for the purpose of stopping the trial from proceeding; the Debtor admitted as much at his Rule 2004 examination, suggesting that his state court attorney had referred him to Attorney Dent for

---

[2] The case is entitled 3rd Sister Investment LLC et al. v. Belken Oil LLC  and William Baker, Jr., and is pending in the circuit court of the Fourth Judicial Circuit, Christian County, Illinois, as case #2014-CH-69. The Plaintiffs in the case filed an adversary complaint against the Debtor seeking to have his debt to them excepted from his discharge based on allegations of fraud and defalcation as a fiduciary. Based on documents attached to the complaint, it appears that the amount in controversy in the matter is in excess of $200,000. The complaint to determine dischargeability has been put on hold pending a determination in this case as to whether the Debtor will receive a discharge.

that very purpose. The attorney for the UST also asked the Trustee about a counterclaim purportedly filed by the Debtor in the state court case but not listed as an asset on the Debtor's schedules. The Trustee identified a notation of the filing of a counterclaim on the state court docket, but the notation did not specifically state which defendant had filed the counterclaim. A copy of a counterclaim filed only by Belken Oil LLC, a co-defendant, was included in exhibits from the Debtor's Rule 2004 examination.

Under cross-examination by Attorney Dent, the Trustee acknowledged that he had not been able to sell the Debtor's interest in either of the undisclosed oil wells and agreed that the Debtor had told him at the Rule 2004 examination that he did not make money from the wells and that one had dried up. The Trustee also agreed that, at his creditors meeting, the Debtor had referenced making a mortgage payment. And the Trustee admitted that he had seen the skidsteer when he drove past the Debtor's residence—it was plainly visible from the road. Finally, the Trustee acknowledged that the Debtor had told him that he had suffered through stage-four throat cancer and that his treatments for the cancer included being "zapped in the head."

The attorneys presented arguments at the close of evidence. The matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central

District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Objections to discharge are core proceedings. 28 U.S.C. §157(b)(2)(J). The issues before the Court arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

*A. The Debtor's request for continuance of the trial was properly denied.*

Before discussing the substantive issues, a review of the denial of the Debtor's request for a continuance of the trial is appropriate. Most certainly, the Debtor feels aggrieved at not being able to testify at the trial. His annoyance, however, should be directed at himself and, perhaps, at his attorney for their joint lack of preparation for the video conference.

Attorney Dent appeared telephonically at the June 18 status hearing and reported that he was ready for trial. The Court discussed with both Attorney Dent and the attorney for the UST that the trial would be held by video conference due to the closure of the courthouse to the public by reason of the coronavirus pandemic. The Court noted that the use of video conferencing for full trials was a new procedure and that detailed instructions regarding participation in the video conference would be forthcoming in a special order. The Video Order was entered July 1 and included details of how witnesses were to appear, how exhibits were to be marked and exchanged for their remote

presentation, and, importantly, three pages of step-by-step instructions for connecting to the video conference system. Attorney Dent did not object to the setting of the trial by video conference and never asked for a continuance or any accommodation before the trial date due to the inability of the Debtor to participate in the video conference.

At the trial, when the Debtor was unable to connect to the video conference, Attorney Dent acknowledged that he had never discussed with the Debtor whether he had a computer with a camera and microphone. He said that he had given the Debtor the log-in information for the video conference and assumed that, because the Debtor did not ask him any questions about that information, the Debtor would be ready to participate. He conceded that, if he had known that the Debtor did not have a computer with a camera and microphone, he could have provided the Debtor with access to such equipment at his law office.

The failure of Attorney Dent to even discuss with the Debtor the detailed instructions regarding participation in the video conference caused the problems here, and the unfortunate result must be charged to Attorney Dent and the Debtor. This case was old, the other party was prepared to proceed, and the reason for the requested continuance was that the Debtor and his attorney had simply failed to prepare. The requested continuance of the trial was properly denied.

To be clear, the Court believes that debtors who do not have camera and microphone enabled computers, or who want to call witnesses who do not have

such equipment, should not be penalized or limited in their ability to fully participate in video conference hearings. Although the courthouses in the Central District of Illinois are generally closed to the public, video conference witness rooms have been created in both the Peoria and Springfield courthouses so that witnesses without the necessary computer equipment may be allowed into the buildings and directed to the witness rooms to participate in hearings. Alternatively, the Court's anecdotal experience suggests many attorneys are having their clients or witnesses come to their law firms and use computers in their offices. Either procedure allows for full participation by the party or witness while maintaining rigorous compliance with both the current public health guidelines and the requirements of the Court's Video Order.

Had Attorney Dent and the Debtor made any effort to prepare for the video conference, they would have discovered the Debtor's inability to fully participate using his own equipment. Attorney Dent says he could have made other arrangements if he had known about the problem. But it was his responsibility to know if his client could connect to the video conference, and his failure to even inquire about the Debtor's computer capabilities caused the unfortunate result for the Debtor here. Again, denial of the requested continuance was appropriate.

### B. The Debtor's discharge must be denied.

The denial of a debtor's discharge is an extreme penalty and §727 must therefore be strictly construed against the objector and liberally construed in

favor of the debtor. *Norton v. Cole (In re Cole)*, 378 B.R. 215, 221 (Bankr. N.D. Ill. 2007) (citations omitted); 11 U.S.C. §727. A discharge in bankruptcy, however, is not a right but a privilege reserved only for the "honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

The UST bears the burden of proof by a preponderance of the evidence in this action to deny the Debtor's discharge. *In re Kempff*, 847 F.3d 444, 447 (7th Cir. 2017). The UST seeks denial of the Debtor's discharge based on allegations of both concealment of assets and the making of false oaths. 11 U.S.C. §727(a)(2), (4). For the reasons set forth below, the Debtor's discharge will be denied under both theories.

### i. 11 U.S.C. § 727(a)(2)

Section 727(a)(2)(A) provides that a discharge will be denied if the "debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition[.]" 11 U.S.C. §727(a)(2)(A). Section 727(a)(2)(B) is similar but covers conduct of a debtor that occurs after filing and involves property of the estate rather than of the debtor. In closing arguments, the attorney for the UST said that the relief being sought against the Debtor here was only related to prepetition conduct and that the allegations under §727(a)(2)(B) made in the complaint regarding postpetition conduct were not being prosecuted. Accordingly, to obtain the relief requested in Count I of

the UST's complaint, the UST must prove: (1) that the Debtor transferred, removed, destroyed, mutilated, or concealed property; (2) that belonged to the Debtor; (3) within one year of filing of the petition; (4) with the intent to hinder, delay, or defraud a creditor of the estate. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002).

The UST alleges in Count I that the Debtor transferred his interests in both real and personal property and then concealed both his continuing ownership interest in his real property and the transfers of personal property to hinder and delay his creditors. "Concealment . . . includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 967 (7th Cir. 1999) (quoting *United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984)) (internal quotation marks omitted). Thus, the concept of concealment is broad and, mostly certainly, covers some of the Debtor's conduct testified to by the Trustee at trial.

The UST's initial focus was on the Debtor's transfer of his residence in Edinburg, Illinois, to his son in 2017. The Debtor disclosed the transfer on his SOFA but failed to disclose that he had retained a life estate in the residence on his schedules and affirmatively told the Trustee at his creditors meeting that he had no interest in any real estate when he filed his bankruptcy case. He also failed to schedule the mortgage on the residence as a secured debt.

An obvious issue with considering the transfer of the Debtor's residence to his son with a reservation of a life estate as a basis for denial of discharge

under §727(a)(2)(A) is the fact that the transfer took place in May 2017—more than one year before the bankruptcy filing. In cases where a debtor has made a transfer but retained control or some equitable interest, however, a doctrine of "continuing concealment" exists to prevent the one-year limitation from protecting the debtor from the consequences of the transfer and concealment. *In re Pansier*, 613 B.R. 119, 144 (Bankr. E.D. Wis 2020). In determining whether the doctrine of "continuing concealment" should apply, courts may look to whether the transfer with retained interest was a secret. *McNichols v. Shala (In re Shala)*, 251 B.R. 710, 714 (N.D. Ill. 2000).

The Debtor's transfer of his residence to his son with the reservation of a life estate was not a secret; the deed was publicly recorded on the same day it was signed. But the Debtor's cashing out of $25,000 of equity from the residence just weeks before filing and his transfer of most of the funds to a friend and to buy a truck for his cousin without keeping any documentation of the transfers was a secret. The Debtor's cashing of his proceeds check from Midland for cash ended the paper trail that the Trustee might have otherwise used to discover the transfers and to trace and recover the funds. And the Debtor's failure to disclose on his SOFA the purchase of the truck for $9000 for David Clark and his transfer of $12,000 to or for the benefit of Rod Jackson unquestionably constituted the concealment of those transfers.

The Debtor admitted to the transfers at his Rule 2004 examination, and it is not disputed that he did not disclose the transfers as required on his SOFA

or at his creditors meeting. The only issue then is whether the transfers were

made by the Debtor with the intent to hinder, delay, or defraud his creditors.

Direct evidence of fraud or the intent to hinder and delay creditors is

rare. Thus, courts consider the following factors as circumstantial evidence of

improper intent:

> (1) The lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002) (quoting *Pavy*

*v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)). When a number

of these factors are established, a presumption of fraudulent intent arises. *Id.*

Many of the factors relevant in considering whether a debtor has acted

with wrongful intent are clearly present with respect to the Debtor's transfer of

$9000 to purchase the truck titled in David Clark's name and the transfer of

$12,000 to or for the benefit of Rod Jackson. In both instances, the Debtor

received no consideration for the transfers. David Clark is the Debtor's cousin;

Rod Jackson was described as a friend. Both transfers were made while the

Debtor was just weeks away from a trial in a contentious state court matter in

which he was facing the possibility of the entry of a significant judgment

against him. The transfers were made in cash and without the Debtor retaining

any records. Both transfers were made within weeks of the Debtor filing bankruptcy, but neither transfer was disclosed as required on the Debtor's SOFA.

The only reasonable inference to be drawn from the circumstances surrounding the transfer of the $9000 for the truck purchase and the $12,000 for the bait shop is that the Debtor made the transfers with the intent to hinder, delay, and defraud his creditors. Cashing the $25,000 proceeds check from his refinance for cash makes little sense and the Debtor never offered any explanation for taking the money in cash at his Rule 2004 examination, in his answer to the complaint, or in his pretrial statement. The only logical explanation is that he wanted to spend the funds without creating any record of his expenditures. His records were so lacking that the Trustee appeared skeptical that Rod Jackson or his bait shop ever existed. And even if they did exist, the Debtor's concealment of the transfers until months after he filed bankruptcy most certainly hindered the Trustee's efforts in recovering the transfers.

The UST has established by a preponderance of the evidence that the Debtor transferred, for no consideration, more than $21,000 in cash just a few weeks before filing bankruptcy, and that he concealed the transfers despite his obligation to disclose them on his SOFA. The UST has also proven by a preponderance of the evidence that the transfers were made with the intent to hinder, delay, and defraud the Debtor's creditors. The Debtor will be denied his discharge for this conduct.

### ii. 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) bars a debtor's discharge if he knowingly and fraudulently makes a false oath in connection with his bankruptcy case. 11 U.S.C. §727(a)(4)(A). "The purpose of §727(a)(4) is to ensure that the debtor provides dependable information to those who are interested in the administration of the bankruptcy estate." *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003) (citation omitted). A plaintiff seeking to deny a debtor's discharge under §727(a)(4)(A) "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (citations omitted). A debtor's fraudulent intent can be established by showing either intentional misrepresentations or a reckless disregard for the truth. *Id.* at 982. Statements made by a debtor on a bankruptcy petition, schedules of assets and liabilities, or SOFA are all considered to be under oath for the purposes of §727(a)(4)(A). *John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004). A fact is material if it relates to the debtor's business dealings, the discovery of assets, or the existence and disposition of the debtor's property. *Stamat*, 635 F.3d at 982.

The UST alleges in Count II of the complaint that the Debtor made false oaths when signing his schedules, in Count III that he made false oaths in signing his SOFA, and in Count IV that he made false oaths in his testimony at his creditors meeting. The UST presented substantial evidence in support of all of the allegations.

The Debtor admittedly failed to schedule his life estate in his residence in Edinburg, Illinois, and his ownership of the skidsteer. He also did not schedule his one-third interest in two oil wells, and his joint ownership with David Clark of Regions Bank account XXX1405. He scheduled his debt to Midland as unsecured; he failed to properly disclose on his schedules that the Midland debt was secured by his residence. It is also not disputed that, in his answers to the several SOFA questions requiring disclosure of all transfers of property made within two years of filing, the Debtor did not disclose his transfer of an interest in an oil well to Bryce Geiler, his transfer of a $9000 truck to David Clark, or his transfer of $12,000 to or for the benefit of Rod Jackson. The Debtor also failed to disclose on his SOFA, in his answer to a question about payments made to creditors within 90 days of the case filing, the $3000 payment made to Sheffield just a couple of weeks before filing. Although the Debtor disclosed his ownership of Midstate on his SOFA, he inaccurately reported that it was a closed business.

At his creditors meeting, the Debtor affirmatively stated that all the information on his schedules and SOFA was accurate with the exception of one small change not relevant here. In response to a specific question from the

Trustee about his disclosure of transfers of property, the Debtor stated that he had disclosed all transfers even though he had not. Likewise, in response to a specific question from the Trustee about whether he had disclosed all payments to creditors made within 90 days before filing, he stated that he had disclosed all such payments even though he had not.

The Debtor's schedules and SOFA were signed under oath and penalty of perjury. *Broholm*, 310 B.R. at 880; Fed. R. Bankr. P. 1007(b); Official Forms 106Dec, 107. The Debtor was under oath at his creditors meeting. There is no doubt therefore that the Debtor made false statements on his schedules, on his SOFA, and at his creditors meeting while under oath.

There is also no doubt that the Debtor's false oaths related materially to his bankruptcy case. Several of the assets not disclosed, such as the skidsteer and the Regions Bank account, have been recovered and liquidated for the benefit of creditors. The transfer of the $9000 truck to David Clark is in the process of being recovered by the Trustee. Other assets, such as the $12,000 spent on Rod Jackson and the bait shop, may be beyond recovery. But proof that creditors were actually harmed is not a required element of causes of action under §727. *Scott*, 172 F.3d at 968 (relying on *Smiley v. First Nat'l Bank (In re Smiley)*, 864 F.2d 562, 569 (7th Cir. 1989). Debtors have a duty to file schedules of assets and liabilities and a SOFA. 11 U.S.C. §521(a)(1)(B). Debtors do not have the option of omitting information that they do not want to include or information that they themselves have decided is irrelevant. To the contrary, the success of the entire bankruptcy system "hinges both upon the bankrupt's

veracity and his willingness to make a full disclosure." *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 498 (7th Cir. 2007) (citation omitted). The information omitted here by the Debtor was clearly relevant and material to the Debtor's case.

The UST must also prove that the Debtor knew the information he was providing under oath was false. The burden of proof may be met by evidence showing actual knowledge by the Debtor that the information he provided was false or by showing his reckless disregard for whether the information was true or not. "[N]ot caring whether some representation is true or false—the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (citations omitted).

The Trustee's testimony established that the Debtor knew the information he had provided was false. The Debtor had to have known that he had retained an interest in the Edinburg residence when he signed the deed to his son in May 2017. Just weeks before filing his bankruptcy he refinanced the property as the principal borrower and signed a mortgage that specifically identified him as having a life interest in the property. He cashed out $25,000 of equity in the property at the time. It would be incredible to believe that he completed the refinance and obtained the $25,000 and yet had absolutely no knowledge at the time that he had any interest in the real estate. Likewise, he cashed the proceeds check from Midland for cash and then, over the course of

just a few weeks, spent the funds. Again, it would be incredible to believe that, when asked about the veracity of his disclosures regarding transfers of property when completing his SOFA and at the creditors meeting, he did not know that he was not disclosing the cash transfers he just recently made with the refinance proceeds.

Similarly, the Debtor knew he had an interest in two oil wells and that he transferred an interest in a third well to Bryce Geiler earlier in 2018. He admitted as much when confronted at his Rule 2004 examination. He also knew he owned the skidsteer and his attorney made a point, at the trial, of having the Trustee acknowledge that the skidsteer was visible to anyone driving past the Debtor's residence. But if it was visible to the Trustee, then it was visible to the Debtor, and he must have known that he had failed to schedule it. The Debtor admittedly knew that his business, Midstate, was a sole proprietorship and, accordingly, must have known that the bank account for the business was in his individual name. Nevertheless, he failed to disclose the account on his schedules.

The Debtor has never really disputed that he knew the true information about his assets, liabilities, and financial transactions, and that his errors and omissions were therefore, most certainly, knowingly made. But the evidence also shows that the Debtor acted with reckless disregard—his conduct evidences little concern about whether the information he was providing was true or false. In closing arguments, Attorney Dent said that the Debtor had been "thoughtless" in his disclosures, but he cited no authority for the

proposition that the "thoughtless" preparation of a debtor's schedules and SOFA is any different than the preparation of such documents with reckless disregard for the truth of the information provided. At best, the Debtor did not care whether his schedules, SOFA, and testimony were true or false and, accordingly, he must be found to have knowingly made false oaths when preparing the schedules and SOFA and testifying at his creditors meeting.

The final element of proof required to deny the Debtor's discharge is that he made his false oaths with fraudulent intent. Fraudulent intent "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *Chavin*, 150 F.3d at 728 (citations omitted). "[A] showing of reckless disregard for the truth is sufficient to prove fraudulent intent." *Stamat*, 635 F.3d at 982 (citations omitted.) The cumulative effect of multiple false statements may evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent. *Id.* (relying on *The Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)).

Here, the Debtor made multiple false statements on his schedules and SOFA and at his creditors meeting. The sheer volume of the errors and omissions raises the conduct from mere negligence to reckless disregard for the truth and justifies denial of the Debtor's discharge. *Stamat*, 635 F.3d at 982; *Gargula v. Nave (In re Nave)*, Adv. #14-0712, 2015 WL 3961768, at *5 (Bankr. C.D. Ill. June 29, 2015) (repeated and significant errors establish a pattern of reckless disregard for the truth). The Debtor's attorney's argument that there is

some middle-ground standard of thoughtlessness that would justify the Debtor's conduct is not supported by any authority. Further, the Debtor's amendment of his schedules and SOFA after the Rule 2004 examination was too little, too late. The amendments were incomplete and did not correct all errors and omissions. Further, the filing of amended documents only after being caught making false oaths does not cure the original wrongful conduct. *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985).

Although controlling case law provides that fraudulent intent can be found based on a totality of circumstances showing reckless disregard for the truth, it is also important to note that, in this case, there is evidence of actual fraudulent intent by the Debtor. The Debtor's cashing of the Midland proceeds check from the refinance of his residence for cash and his testimony that he spent most of the money through cash transactions evidences an intent to defraud creditors. The Trustee was skeptical of the Debtor's testimony at his Rule 2004 examination that he spent $12,000 of the cash on Rod Jackson and his bait shop. The Trustee's skepticism appears warranted as it seems incredible that the Debtor would spend so much money at such a critical time in his life on someone he knows so little about that he could not even provide the Trustee with a home address for Rod Jackson or a location for the bait shop. The only explanation for using cash for such large transactions is that the Debtor wanted to limit the ability of creditors and the Trustee to trace the expenditures. The Debtor's testimony about the Rod Jackson/bait shop transaction—whatever that transaction was—provides clear evidence of an

intent to defraud creditors, and his subsequent failure to disclose the transaction on his SOFA bolsters the finding of actual fraudulent intent.

Similarly, the multiple stories told by the Debtor about the travel trailer located at his residence and occupied by David Clark provide evidence of actual intent to defraud creditors. On his SOFA, the Debtor said that he had possession of the trailer and that it was owned by David Clark. At his Rule 2004 examination, the Debtor said that he owned the trailer and had the title to it. He told an involved story regarding the sale of an airplane and the transfer of the title to the trailer to him by his uncle in partial payment for his share of the plane. He also volunteered that, when he was diagnosed with cancer in 2017, he had told his wife that the trailer would be hers if he died. But after giving that testimony under oath, he answered the complaint here by affirmatively stating that he had given the trailer to David Clark more than five years prior to filing his bankruptcy. All of the conflicting information cannot be true, and the Debtor's repeatedly changing stories about the trailer suggest a desire to try to keep the trailer for himself and his cousin to the detriment of his creditors. Although the Court does not know which, if any, of the several stories might be true, it is clear that at least some of the stories told by the Debtor were intentionally false.

There can be no question but that the Debtor made false oaths on his schedules and SOFA and at his creditors meeting with the intention of defrauding his creditors. His discharge must be denied.

### IV. Conclusion

The UST met the burden of proof required to deny the Debtor's discharge for concealment of assets and for making false oaths on his schedules and SOFA and at his creditors meeting. The proof was strong and clearly established that the Debtor acted knowingly and with fraudulent intent. His discharge will be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ###